UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | Criminal No. 12-CR-59 (EGS) |
| v. : | |
| : | |
| DARNELL ANTONIO PARKER : | |
| : | |
| Defendant. : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case.

## PROCEDURAL BACKGROUND

The defendant, Darnell Antonio Parker, was arrested on March 1, 2012, and subsequently indicted by a Grand Jury on three counts. The defendant was indicted by the grand jury with Conspiracy to Distribute and Possess with Intent to Distribute 5 Kilograms or More of Cocaine and 280 Grams or More of Cocaine Base, in violation of Title 21, United States Code, §§ 841(a)(1), 841(b)(1)(A)(ii), 841(b)(1)(A)(iii), and 846, Unlawful Possession with Intent to Distribute Five Kilograms or More of Cocaine, in violation of 21 USC §§ 841(a)(1) and 841(b)(1)(A)(ii), and Laundering of Monetary Instruments in violation of 18 USC §1956(a)(1)(B)(i).

On December 21, 2012, the defendant pled guilty to one count of Conspiracy to Distribute and Possess With Intent to Distribute Five Kilograms or More of Cocaine in violation of 21 USC §§ 841(a)(1), 841(b)(1)(A)(ii), and 846, as well as one count of Laundering of Monetary Instruments, in violation of 18 USC §1956(a)(1)(B)(i).

1

**FACTUAL BACKGROUND**

From at least September 2010, up to and including March 1, 2012, within the metropolitan area of the District of Columbia, and elsewhere, the defendant unlawfully, knowingly, and intentionally conspired and agreed with a number of persons, both known and unknown to the government, to unlawfully, knowingly and intentionally distribute and possess with intent to distribute, cocaine hydrochloride.  As part of this conspiracy, Parker is accountable for at least 15 kilograms of powder cocaine.  This is an amount either distributed directly by Parker or was reasonably foreseeable to him as distributed by others in the conspiracy.

During the time period of the conspiracy, Parker sold large amounts of cocaine to co-conspirator Kevin Heyward approximately 2-4 times a month.  When Heyward and Parker met to exchange money and narcotics they usually met at co-conspirator Kim Boone's residence, most recently 6816 Westchester Court, Temple Hills, Maryland, though they sometimes met at hotel rooms.  Heyward usually paid Parker $33,000 to $34,000 per kilogram of powder cocaine.  Parker was aware that after Heyward purchased the cocaine from Parker, he distributed it to other people in the Washington, D.C. Metropolitan area. Parker was aware that Heyward also purchased cocaine from at least one other person.

Parker and Heyward often communicated using cellular telephones. To avoid law enforcement detection, Parker provided Heyward with cellular telephones that he replaced often which were to be used exclusively for conversations with Parker. Often, however, Heyward would forget, fail to charge, or lose the telephone Parker had provided.  As a result to two would speak occasionally on Heyward's personal telephone.  For example, on July 13, 2011, at 3:40 p.m., in activation 1811, on Target Telephone 1, Heyward said to Parker, "What's up man?" Parker said, "I'll be there at five, be at Shorty's at about five thirty." Heyward said, "You'll be

2

there at five thirty?" Parker replied, "Yeah." Heyward said, "Alright."  Parker said, "Go get the joint charged up." Heyward said, "You'll see the five." Parker said "I know. We'll talk about that later, boy. I said charge your joint." Hewyard said, "Yeah. No, I'mma try to charge it up when I get to the house." Parker said, "No. Take it with you. Take it back to Shorty's house with you." Heyward said, "Ok. Yeah." In this conversation, Parker told Heyward to charge the telephone that Parker gave to him so that they could communicate about their narcotics transactions.  When Heyward tried to talk about the narcotics deal, Parker told Heyward that they would talk about "that" later.  Parker did not want to speak about narcotics activity while over the cellular telephone that was not the one he provided to Heyward because they risked detection by law enforcement.

    There were times when Parker and Heyward did discuss the sale of narcotics on Heyward's personal phone. For example, on August 28, 2011, at 3:44 p.m., in activation 9478, on Target Telephone 1, in a conversation with Parker who was using telephone number (240) 462-7023, Heyward asked "How in the hell I'm a see you?" Parker said "Ah, it's on you." Heyward said "Give me a couple hours and call me back."  Parker asked "What you was talking about, one, two?"  Heyward said "That one right now.  Parker responded, "Alright, cool." Heyward then said, "As soon as you hit me back I'll tell you."  In an interception later that day at 5:30 p.m., in activation 9505, on Target Telephone 1, Parker asked "Around seven, eight?" Heyward said "Nah, meet me over there around six thirty." Parker asked "You said one, right?" Heyward said "Yeah, I was trying to wait on this joker to . . . you know both of them but . . . ." Parker said "I can get it now . . . , do it like seven o'clock, (UI) it's five thirty now."  In this conversation Heyward and Parker discussed when to meet to conduct a narcotics transaction.

3

Parker asked Heyward if he wanted one or two kilograms of narcotics to which Heyward replied he only had enough money for one.

During interceptions on Target Telephone 4, Parker continued to provide Kevin Heyward with narcotics. On January 2, 2012, in activation 1576, at approximately 1:12 p.m., in an intercepted communication between Parker on Target Telephone 4, and Kevin Heyward on Target Telephone 1, Kevin Heyward said, "Man I wait for you since ten o'clock to call me man." Parker replied, "I call you last hour. You didn't answer the phone. [UI] sleep or something." At approximately 3:00 p.m., in activation 1592, in a conversation between Kevin Heyward using Target Telephone 1, and Parker on Target Telephone 4, Parker said, "I'll be about three, four, five minutes. Where you at?" Kevin Heyward replied, "hm, I'm at the house. I was running…Kim is…can you pull up? Come and talk to Kim. When you pull up, come inside and Kim. Come right in and talk to Kim." Parker replied, "alright". In activation 1596, at approximately 3:38 p.m., in a conversation on Target Telephone 1 and Target Telephone 4, Kevin Heyward said he was "pulling up," thereby letting Parker know that he was about to arrive at their meeting location. In activation 1597, at approximately 3:42p.m., Kevin Heyward called Parker again and asked "what room is it?" to which Parker replied "426." Kevin Heyward replied "alright, open the door." In these communications, Parker and Heyward discussed meeting at the Towne Place Marriott hotel located in Clinton, Maryland. Kim Boone had rented a room so that the two could meet. During the meeting Heyward and Parker exchanged money and narcotics. Law enforcement conducted surveillance of the hotel and observed Parker as he exited the hotel and carried a large box to his silver Honda Accord. Agents observed Parker getting into the driver side of the Honda Accord and place something into the backseat of the vehicle. In addition, law enforcement obtained surveillance video from the hotel that showed Parker as he

entered the hotel carrying a large cardboard box and a small white plastic bag.  Both when Parker entered and exited he carried either cocaine or money into and out of the hotel.

The following day, January 3, 2012, in activation 1705, at approximately 11:23 a.m., Parker, using Target Telephone 4, spoke with Kevin Heyward who used Target Telephone 1. Kevin Heyward said, "Man, thing horrible man. . ." Parker replied, "[UI] I got no problem at all. . . I'll call you back later . . . ain't no problem with nothin, period. I'll see you in a little while." Kevin Heyward answered, "Aight. Call me when you come up." In this conversation, Kevin Heyward complained that the cocaine he had received from Parker at the hotel had been of poor quality.

On March 1, 2012, members of the Federal Bureau of Investigation/Metropolitan Police Department Safe Streets Task Force (SSTF) had reason to believe that Parker, was driving a silver Honda Accord containing a large amount narcotics or proceeds of narcotics sales.  SSTF Members initiated surveillance on Parker driving the vehicle, observed him stop at a service station in Washington, DC, and continued to follow him into a parking lot in Oxen Hill, MD. Parker was alone in the vehicle during the surveillance.  SSTF members then observed Parker park the Honda Accord, exit the vehicle, kneel near the driver's side of the Honda and manipulate something inside the vehicle. A few moments later, SSTF members stopped Parker a distance away after he entered another vehicle driven by Milton Swinson.  A search of the Honda Accord driven by Parker revealed approximately $10,000 in cash underneath the front passenger seat, and two secret compartments located in the side panels in the back seat of the vehicle.  In one of the compartments, law enforcement discovered six large compressed bricks of cocaine. The Drug Enforcement Administration conducted an analysis of the substance recovered from the Honda, and determined it to contain cocaine hydrochloride, and found the total weight of the

substance to be 5977 grams. A search of Parker's person revealed approximately $10,000 in U.S. Currency.

Between on or about September 2010 through on or about March 1, 2012, Parker used his Bank of America credit card ending in 5942 to purchase various items and services. Parker then used proceeds from his narcotics activities to make payments on his Bank of America credit card. Parker made payments by visiting a Bank of America branch in Virginia, Maryland, or Washington, D.C., and providing cash to a bank teller to be credited to his account. Parker made payments on his credit card in this manner to conceal and disguise the nature, location, source, ownership, and control of the narcotics proceeds. Specific examples of payments made by Parker at a Bank of America branch in Washington, D.C., are set forth in the chart below.

| **Date** | **Financial Transaction** | **Amount of Transaction** |
|---|---|---|
| On or about Dec. 10, 2010 | Payment at Bank of America branch of Parker's credit card ending in 5942 | $900 |
| On or about May 19, 2011 | Payment at Bank of America branch of Parker's credit card ending in 5942 | $600 |
| On or about Sept. 16, 2011 | Payment at Bank of America branch of Parker's credit card ending in 5942 | $5,000 |
| On or about Sept. 27, 2011 | Payment at Bank of America branch of Parker's credit card ending in 5942 | $2,900 |
| On or about Jan. 03, 2012 | Payment at Bank of America branch of Parker's credit card ending in 5942 | $2,000 |

## SENTENCING CALCULATION

A. Statutory Maximums

The penalty for conspiring to commit a narcotics offense, in violation of 21 U.S.C. § 846, is the same as that prescribed for the substantive offense, "the commission of which was the

object of the… conspiracy."  In this case, the penalty is the same as for a violation of 21 U.S.C. § 841(a)(1), as set forth in 21 U.S.C. § 841(b)(1)(A)(ii), distribution or possession with intent to distribute cocaine.  The maximum penalty therefore is a sentence of life imprisonment, a mandatory minimum sentence of 10 years, a fine not exceeding $10,000,000, and a term of supervised release of five years.

A person convicted under 18 U.S.C. 1956(a)(1) shall be sentenced to a maximum sentence of 20 years imprisonment, a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, and a term of supervised release of not more than three years.

    B.  <u>Sentencing Guidelines Calculation</u>

The Guideline calculation in the Presentence Report (PSR) places the defendant's base offense level at 34.  <u>See</u> PSR ¶15.  A two-level enhancement to the offense level is applicable pursuant to § 2S1.1(b)(2)(B) of the United States Sentencing Commission, <u>Guidelines Manual</u>, (U.S.S.G.) 2012 edition, as the defendant was convicted under 18 U.S.C. § 1956.  This brings the defendant's offense level to 36.  However, the defendant is a career offender, and under § 4B1.1(b)(1), his offense level becomes 37.

The plea agreement provides a two point reduction in the offense level, pursuant to § 3E1.1(a) of the United States Sentencing Commission, <u>Guidelines Manual</u>, (U.S.S.G.) 2012 edition.  <u>See</u> PSR ¶16.  Furthermore, the government requests that the defendant receive an additional one point adjustment for acceptance of responsibility pursuant to U.S.S.G., § 3E1.1(b).  The defendant's total offense level is therefore 34.

The PSR notes that the defendant has a total criminal history score of six, and therefore his criminal history category is III.  <u>See</u> PSR ¶21.  However, because the defendant is a career

offender, his criminal history category is VI pursuant to USSG §4B1.1(b). The defendant's guideline imprisonment range for a total offense level of 34, criminal history category VI, is 263 months to 327 months pursuant to USSG §5G1.1(c)(1). [1] See PSR ¶31.

## SENTENCING RECOMMENDATION

The government requests that the defendant be sentenced to a term of imprisonment of 262 months for count 1, which is at the low end of applicable Sentencing Guidelines range.[2] As discussed below, the government makes this recommendation after considering the sentencing factors enumerated in 18 U.S.C. § 3553(a) and the guidelines and policies promulgated by the United States Sentencing Commission, as well as the nature and circumstances of the defendant's criminal actions in this case, his criminal history, and his pre-trial acceptance of responsibility.

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." United States v. Gall, 128 S. Ct. 586, 594 (2007)(citation omitted). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark." Id. at 594-596 (citation and footnote omitted). The district court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Id. at 596. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). United States v. Rita, 127 S. Ct. 2456, 2463-2465 (2007).

---

[1] The defendant has asked the Court for a downward departure of his criminal history category by one level pursuant to U.S.S.G. § 4A1.3(b)(1) and the limitation imposed in U.S.S.G. § 4A1.3(b)(3)(A). Should the Court grant such a departure, the defendant's Criminal History Category is reduced to Category V. His guideline range would then be 235-293 months. The Government does not oppose this motion.

[2] If the Court grant's the defendant request for a downward departure of his Criminal History Category, the applicable sentencing range becomes 235-293 months. Accordingly, the Government's requested sentence would be 235 months, the low end of the applicable guidelines range.

The Section 3553(a) factors include (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment, (3) the Sentencing Guidelines and related Sentencing Commission policy statements, and (4) the need to avoid unwarranted sentence disparities.

The Government's recommendation of the low end of the applicable guidelines range falls within the factors set forth in Section 3553. There can be no doubt the defendant contributed greatly to the amount of cocaine that was on the streets of the Washington, D.C. metropolitan area. The defendant is responsible for supplying a large scale narcotics operation with significant amounts of powder cocaine for several years. When the defendant was arrested on March 1, 2012, he was in possession of almost six kilograms of powder cocaine that were packaged in brick form and obviously intended for further distribution. The defendant consistently sold one to three kilograms at a time of powder cocaine to Kevin Heyward, often multiple times a month. Kevin Heyward then divided the powder cocaine provided by the defendant into amounts for further distribution to Heyward's numerous customers throughout the Washington, D.C. metropolitan area. In addition, Heyward cooked much of the powder cocaine provided by the defendant into crack cocaine which was also sold to numerous customers and then distributed further. While the government has agreed to limit allocution to the low end of the sentencing guideline range, the defendant's guideline range is 262 months, an amount of time given his age, that adequately reflects the seriousness of the defendant's offense while at the same time balancing his early desire to accept responsibility and plead guilty.

## **CONCLUSION**

WHEREFORE, based upon the above and the information reflected in the Presentence Report, the United States respectfully requests that the defendant be sentenced within the currently applicable Sentencing Guideline range to the low end of the sentencing range, to be followed by a period of five years of supervised release, and that such sentence be served consecutively to any other sentence.

Respectfully submitted,
RONALD C. MACHEN, JR., Bar No. 447889
UNITED STATES ATTORNEY

By: ___-s-_____
MICHELLE A. ZAMARIN, Bar. No. 474042
(202) 514-7063
michelle.zamarin@usdoj.gov
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530